UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOAN METZ,

          Plaintiff,

v.                                 CASE  No.  8:06-CV-394-T-TGW

THE HOME DEPOT, U.S.A.,
INC.,

          Defendant.

_____

## O R D E R

THIS CAUSE came on to be heard upon the defendant's Dispositive Motion for Summary Judgment (Doc. 24) and the plaintiff's opposition thereto (Doc. 32).  Because the plaintiff's claims of gender and national origin discrimination based on disparate pay are barred for failure to comply with administrative prerequisites, and the plaintiff has failed to raise a genuine issue of material fact as to any of her discrimination or retaliation claims, summary judgment will be granted to the defendant on all of the plaintiff's claims.

I.

The plaintiff Joan Metz, who is white, began working for defendant Home Depot, U.S.A., Inc., in 1994.   In November 2003, the plaintiff obtained the position of assistant store manager ("ASM") of operations for the defendant's new store in Zephyrhills, Florida.  Carlos Fines, who is Hispanic, was the store's manager and the plaintiff's direct supervisor. The other ASMs during the pertinent time were Jay Roth (white male), Anna Apanovich (Hispanic female), Jose Avellaneda (Hispanic male), and Lance Chewning (white male).   Deborah Scalone (white female) was the store's human resources manager.[1]

The plaintiff alleges that in April 2004 Fines began a campaign of harassment against her (Doc. 33, Ex. 7, p. 52).   She asserts that Fines withheld from her the guidance, information and support that he extended to other employees.   For example, the plaintiff claims that Fines failed to give her information about sales promotions  and that, when Fines called the store, he requested to speak with managers other than her (id. at pp. 53-58). Additionally, the plaintiff alleges that, on several occasions, Fines subjected

---

[1]Scalone had a lawsuit pending in this court asserting claims of sexual harassment, national origin discrimination, and retaliation based on factually related allegations (Case No. 06-CV-492-T-27TGW).  Summary judgment has been entered against her in favor of the defendant (Doc. 43).

her to extraordinary audits of her department and attempted to undermine the plaintiff's relationship with subordinates by asking them about her leadership (id. at pp. 52-53, 62-63, 65-68, 71-77).

Moreover, the plaintiff alleges that Fines attempted to turn the female assistant managers against each other.  In this connection, the plaintiff contends that Fines told the plaintiff that Apanovich was upset about an incident that the plaintiff had thought she resolved with Apanovich regarding boxes that had been left in the aisle of the paint department (id. at pp. 78-82). The plaintiff also states that she felt physically threatened by Fines when he screamed at her for placing a pressure washer in his office and on a second occasion when Fines barged in on a meeting and screamed at her with a look of rage on his face (id. at pp. 100-01).

The plaintiff was not the only ASM that had difficulties working with Fines.  In October 2004, Scalone and Apanovich independently called district manager Patrick Dixon about Fines's conduct and management style (see Doc. 34, Ex. 10, pp. 37, 40).  Scalone stated that she decided to call Dixon after Fines told her that, if the plaintiff was getting all the managers against him, he would call Annette Blackerby, regional human resources

director, to come to the store and he would take the plaintiff down before she took him down (Scalone Dep.,[2] pp. 90-91; Doc. 33, Ex. 6, HD 0973).

Thereafter, Dixon conducted at the store one-on-one interviews with Scalone and the ASMs, with the exception of Avellaneda (Doc. 34, Ex. 10, pp. 40-42). The plaintiff told Dixon that Fines was "manipulative, retaliatory, that he lied, that he was vindictive, [and] that he was insecure" (Doc. 33, Ex. 7, p. 106). The plaintiff recounted to Dixon some of the incidents stated above to exemplify how Fines was purportedly targeting her (id. at p. 107). The plaintiff did not tell Dixon that she believed that any of Fines's conduct toward her was based on her age, sex, or national origin, or that it involved any conduct or comments of a sexual nature (see id. at pp. 106-07; id. at Ex. 6, HD 0979, 0981).

Dixon's interviews with other ASMs and Scalone revealed complaints of a hostile work environment from both women and men, a fear of retaliation, and a perception of favoritism toward Avellaneda, a Hispanic ASM (see Doc. 33, Ex. 6, HD 0976-81). There were also complaints of inappropriate comments. In this connection, Scalone stated that Fines would

_____

[2]Scalone's deposition is filed as a paper copy in the court docket (Docs. 47, 48).

attempt to set her up on dates and, when a male hourly employee moved into her home, Fines asked her what she would do if he got a "hard on" (Scalone Dep., pp. 79-82; Doc. 33, Ex. 6, HD 0974).   Fines also allegedly told Apanovich that she needed a "real man" to control her (see Doc. 33, Ex. 6, HD 0975).

As a result of the defendant's investigation, Fines was issued a Final Counseling Discipline Notice for violating work rules regarding associate behavior and respect (id. at HD 0970).  The notice warned Fines that "[f]ailure to follow the expectations outlined will result in further disciplinary action up to and including termination" (id.).   Fines was also strongly admonished not to retaliate against the ASMs, and was told that any perceptions of retaliation would result in further disciplinary action and his possible termination (Doc. 34, Ex. 10, p. 69).

Dixon met with the plaintiff, Scalone, Apanovich, and Chewning as a group to inform them of the disciplinary action taken against Fines.  He advised them of the defendant's retaliation policy, and to report any future problems to him, Blackerby, a manager, or Home Depot's "Alert Line" (id. at pp. 51, 68-69; Ex. 7, p. 112).  Dixon monitored the situation and Fines's conduct improved (Doc. 34, Ex. 10, pp. 70-71, 74).  Dixon was also told that

Fines had become very businesslike, cautious, and would not engage in personal conversations (id. at p. 71).

In January or February 2005, Dixon had lunch with a group of ASMs to inquire if their working conditions had improved (id. at pp. 72-73). Although the plaintiff did not recount any incidences of mistreatment or angry exchanges with Fines since her meeting with Dixon in October, she asserted that Fines continued to "distanc[e] himself from [her]" and favor Avellaneda (Doc. 33, Ex. 7, pp. 115-17). Avellaneda was transferred to another store effective January 15, 2005 (Doc. 27, ¶24).

In March 2005, Scalone was terminated after the defendant substantiated allegations that she violated company policy when she transferred an employee to a new position without allowing others to interview for the opportunity, and then falsified her interview results (id. at ¶¶ 3-8).[3] On March 2, 2005, during the investigation into Scalone's misconduct, Scalone was asked to leave the Zephyrhills store.   The plaintiff and Apanovich walked Scalone to her car, and the plaintiff told Scalone that she and Apanovich would get whatever she needed (see Doc. 27-3, p. 4).  Later

_____

[3] Scalone's termination letter also cited a conflict of interest regarding relationships with hourly associates, and an allegation that she sought confidential information from her peers during the investigation into her misconduct (Doc. 25-20).

that day, the plaintiff went into Scalone's office and made copies of a confidential document that listed ASM salary information (Doc. 33, Ex. 7, pp. 138, 142; Doc. 34, Ex. 11, pp. 75-79).  The plaintiff spoke with Apanovich about the document and gave her a copy  (Doc. 33, Ex. 7, pp. 138, 144; Doc. 34, Ex. 11, pp. 77-79, 172-74).  According to Apanovich, the plaintiff stated that she was taking the document to Scalone, because she was going to need it (Doc. 27-3, p. 6).  Apanovich stated that she warned the plaintiff that she was crazy for taking the document and tried to reason with her, but the plaintiff left the store with the document anyway (id.; Doc. 34, Ex. 11, pp. 75-79).

Apanovich alerted Dixon that the plaintiff had taken this confidential document and that she intended to share it with Scalone (Doc. 27, ¶9; Doc. 27-3; Doc. 34, Ex. 10, pp. 137-38; id. at Ex. 11, pp. 123, 174-76).  Dixon contacted Blackerby to have her handle the situation because he was out of town (Doc. 34, Ex. 10, p. 138).  Apanovich called Dixon again the following day after the plaintiff informed Apanovich that she printed some paperwork for Scalone (Doc. 27-3; Doc. 34, Ex. 11, pp. 199-01).  Blackerby and Joe Panza, the defendant's employment practices manager, investigated

the incident, which included obtaining written statements from Apanovich and Chewning (Doc. 27, ¶¶ 9-10; Docs. 27-3, 27-4).

On Friday, March 4, 2005, the plaintiff had the day off from work.  On that day, district loss prevention manager Elena Kontamanys conducted a shrink performance review ("SPR") of the Zephyrhills store, which is a monthly assessment of the store's loss prevention efforts (Doc. 28, ¶¶ 1, 3, 4). Kontamanys conducts the SPRs before the fifteenth of each month, and she schedules them as she is available (id. at ¶¶ 3, 5, 7).  The plaintiff asserted that, with the exception of the SPR on March 4, 2005, Kontamanys always gave her prior notice of the audits and they were normally conducted on Tuesdays (Doc. 33, Ex. 7, pp. 162, 167-68).  The store earned a failing score on the March 4 SPR, which was partially attributable to the plaintiff because she had failed to file certain documentation (id. at pp. 169-71).  However, the plaintiff was not disciplined for this failure because the store manager is ultimately responsible for the store's SPR score (Doc. 28, ¶4).

That same day, Blackerby and Panza telephoned the plaintiff at home regarding Apanovich's allegation that she had taken a confidential document from the store and had given it to Scalone (Doc. 33, Ex. 7, pp. 142, 158-60; Doc. 27,  ¶¶ 9, 11).  Although the plaintiff admitted during her

deposition that she had taken the confidential salary document, Blackerby stated that, at the time of the investigation, the plaintiff denied taking it (Doc. 27, ¶11; Doc. 33, Ex. 7, pp. 142-43, 158-59).[4]   The plaintiff was asked to provide a written statement of her position, and she was told to return to work on March 6, 2005 (Doc. 27, ¶11).

The plaintiff did not give a written statement (id. at ¶12). Nonetheless, it was decided that the plaintiff would receive only a counseling notice since it was the plaintiff's word against Apanovich's regarding whether the plaintiff had deliberately taken the confidential document (id.).

The plaintiff never received the intended disciplinary action because she requested a leave of absence pursuant to the Family and Medical Leave Act ("FMLA") (see Doc. 33, Ex. 7, pp. 179).   In this connection, the plaintiff stated that she saw a nurse practitioner on March 7, 2005, because her face had become numb during her telephone call with Blackerby and Panza, and the nurse practitioner advised the plaintiff that the facial paralysis could

---

[4] The plaintiff argues, disingenuously, in her opposition memorandum that she "did not know what [Blackerby and Panza] were referring to" when they questioned her about taking a confidential document  (Doc. 32, pp. 10, 20).  However, the plaintiff clearly understood that Blackerby was referring to the confidential salary information, as the plaintiff testified that she destroyed the salary document after speaking with Blackerby "because obviously it was information that they didn't want me to have" (Doc. 33, Ex. 7, pp. 142-44).

be caused by stress at work (id. at pp. 160, 176, 179-80).  Consequently, the nurse wrote a note indicating that the plaintiff needed to take a medical leave of absence (Doc. 25-8).

On August 5, 2005, while the plaintiff remained on FMLA leave, the plaintiff's attorney wrote to the defendant, contending that the plaintiff had not been paid all the accrued vacation time to which she was entitled (Doc. 25-21).  The defendant responded in correspondence dated August 16, 2005, that explained how it computed her vacation pay and when it was paid to her (Doc. 25-22).

On September 26, 2005, the plaintiff resigned her employment pursuant to the recommendation of her treating physician (Doc. 25-9).[5]  On April 7, 2005, the plaintiff, through her attorney, filed a charge of discrimination against the defendant, alleging age discrimination and retaliation for reporting unlawful discrimination (Doc. 1, Ex. A). The EEOC

---

[5]The plaintiff argues that this was a constructive termination (Doc. 32, pp. 10-11). However, there is no separate claim of constructive discharge made in her complaint.  In this circumstance, the plaintiff cannot raise a claim of constructive discharge in a response to a motion for summary judgment.  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004).  Furthermore, the plaintiff has not properly developed any such claim since she has cited no case articulating the rigorous standard for a constructive discharge (see Doc. 32, pp. 10-11).  In addition, a claim of constructive discharge cannot reasonably be predicated on a stress-related disorder that is brought on by the plaintiff's violation of an important company policy or by an unscheduled SPR (id).

issued a right-to-sue letter, which was received by the plaintiff on December 8, 2005 (see Doc. 25-11).

The plaintiff filed this lawsuit ninety-one days later, on March 9, 2006. Diverging from the allegations made in the charge of discrimination, the lawsuit alleges sex and reverse national origin discrimination,[6] hostile work environment sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act ("Title VII") and the Florida Civil Rights Act ("FCRA") (Doc. 1).[7] The parties subsequently consented to the exercise of jurisdiction by a United States Magistrate Judge (Docs. 37, 40).

The defendant has filed a motion for summary judgment on all of the plaintiff's claims (Doc. 24). The defendant argues that the Title VII claims and the FCRA discrimination claims are barred for failure to comply with procedural requirements. Additionally, it contends that it is entitled to summary judgment on the merits of all of the plaintiff's claims. The plaintiff has filed a memorandum in opposition to the motion (Doc. 32), arguing that none of the claims are procedurally barred and genuine issues of material fact

---

[6]Specifically, the plaintiff alleges that Fines treated Hispanic employees more favorably.

[7]In May 2006, after she had filed this lawsuit, the plaintiff filed a second charge of discrimination, alleging claims of sex and national origin discrimination (Doc. 25-12). Specifically, she alleged that male and Hispanic employees were treated more favorably and received higher salaries than she did.

exist as to the merits of each of her claims.  Oral argument was held on the motion.

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  F.R.Civ.P. 56( c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  The movant bears the burden of establishing the absence of a dispute over material facts.  Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991).  Alternatively, the movant may come forward with "affirmative evidence demonstrating that the

nonmoving party will be unable to prove its case at trial." Id. at 1438. If the moving party does not meet its burden, then the motion for summary judgment will be denied.  Id. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved  in favor of the party opposing  the motion for summary judgment.  Id.

III.

A.  The defendant argues that it is entitled to summary judgment on the plaintiff's Title VII claims because she did not comply with the

statutory requirement to file the lawsuit within ninety days of receiving the right-to-sue letter (Doc. 24, pp. 16-17).  See 42 U.S.C. 2000e-5(f)(1).  It is undisputed that the plaintiff's lawsuit was filed ninety-one days after she received her right-to-sue letter.

The plaintiff argues that the lawsuit is timely because it was filed within ninety days of her *attorney's* receipt of the right-to-sue letter on December 9, 2005 (Doc. 32, pp. 12-13).  The plaintiff, however, provides no apposite legal authority supporting her contention that the statute of limitations commences upon the later of when the plaintiff, or her counsel, received the right-to-sue notice.  To the contrary, the statute provides that a lawsuit can be filed within ninety days after giving notice to the "person aggrieved." 42 U.S.C. 2000e-5(f)(1).  Accordingly, the Eleventh Circuit has held that the "ninety-day period ... begins to run upon receipt of [the] certified letter at plaintiff's residence."  Norris v. Fla. Dept. of Health and Rehabilitative Servs., 730 F.2d 682 (11th Cir. 1984); see also Kerr v. McDonald's Corp., 427 F.3d 947, 952 (11th Cir. 2005).  Therefore, where, as here, the plaintiff has already received the right-to-sue letter, "[t]he date that Plaintiff's counsel received the notice is irrelevant...." Martinez v. U.S. Sugar

Corp., 880 F. Supp. 773, 777 (M.D. Fla. 1995), aff'd w/o op., 77 F.3d 497 (11th Cir. 1996).

The plaintiff claims that the ninety-day filing period did not commence until her attorney received the right-to-sue letter because she had requested the administrative agency to send the notice to her counsel (Doc. 32, p. 13).  In support of this contention, she cites to the inapposite case of Stallworth v. Wells Fargo Armored Services Corp., 936 F.2d 522 (11th Cir. 1991).  In Stallworth, the Eleventh Circuit equitably tolled the ninety-day period for filing a Title VII lawsuit because the plaintiff never received her right-to-sue letter due to a change of residence, and the EEOC failed to send a copy of the letter to plaintiff's counsel, as she had requested.  Id. at 524-25. In this regard, the Eleventh Circuit stated (id. at 524):

> Where ... it is shown that the claimant through no fault of her own has failed to receive the suit letter ... the delivery of the letter to the mailing address cannot be considered to constitute statutory notification.

However, the plaintiff in this case received her right-to-sue letter at her mailing address in a timely manner (see Doc. 25-11).  Further, there is no evidence in this case of wrongdoing by the EEOC, or any other basis for the application of equitable estoppel.  Rather, the failure to file the complaint

timely falls squarely on the plaintiff.  See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.").  Therefore, summary judgment in favor of the defendant on the plaintiff's Title VII claims in Counts I through IV is warranted because the plaintiff failed to comply with §2000e-5(f)(1)'s requirement that a Title VII lawsuit be filed within ninety days of her receipt of the right-to-sue letter.  Moreover, she has not presented any basis to equitably toll this statutory requirement.

          B.  The defendant argues further that the plaintiff's FCRA claims of gender and national origin discrimination and hostile work environment sexual harassment are barred because the plaintiff did not file timely a charge of discrimination regarding those allegations (Doc. 24, pp. 17-18).  The plaintiff's initial charge of discrimination, which appears to have been carefully drafted by an attorney and includes a page of particulars and a statement of personal harm, solely alleged claims of age discrimination and retaliation (Doc. 1, Ex. A).[8]  Further, the resulting administrative investigation did not expand into other types of discrimination.

─────────────────

[8]Specifically, the plaintiff stated that Fines made "harassing comments with regard to [her] age, [her] gray hair and the status of [her] retirement account" (Doc. 1, Ex. A).  Further, she alleged that the SPR and the investigation into her removing a confidential document from the store were retaliatory acts for complaining about Fines's misconduct.

-16-

The scope of a judicial complaint is limited to the allegations made in the charge of discrimination and claims that "can be reasonably expected to grow out of the discrimination charge." Gregory v. Georgia Dept. of Human Resources, 355 F.3d 1277, 1280 (11th Cir. 2004). A claim can be reasonably expected to grow out of the discrimination charge if it is "like, related to, or grew out of, the allegations contained in her EEOC charge." Id.

The plaintiff asserts that "[i]t is reasonable to believe that [her initial charge of discrimination] would cause the scope of an administrative investigation to include gender and national origin discrimination" and, therefore, these claims are not barred (Doc. 32, p. 14).[9] This is a reasonable conclusion with regard to the plaintiff's sexual harassment claim, but not as to the claims of gender and national origin discrimination premised on disparate pay.

The plaintiff's sexual harassment claim could have reasonably been expected to grow out of the initial charge of discrimination because that charge is replete with references to harassment, and specifically mentions sexual harassment, sexual comments, and the creation of a hostile work

_____

[9]The plaintiff affirmed at the hearing on this motion that she is not arguing that the second discrimination charge, which expressly alleges these claims, relates back to the first charge of discrimination. See Balazs v. Liebenthal, 32 F.3d 151, 157 (4th Cir. 1994).

environment (Doc. 1, Ex. A).  Thus, these references could reasonably signal the existence of such a claim and prompt an investigation into those allegations.  Therefore, the plaintiff's sexual harassment claim is not barred for failure to exhaust administrative remedies.

On the other hand, the plaintiff's FCRA claims of gender and national origin discrimination based on disparate pay are barred because there is not a hint of a pay disparity in the initial discrimination charge and "allegations of new acts of discrimination are inappropriate" in a judicial complaint.  Gregory v. Georgia Dept. of Human Resources, supra, 355 F.3d at 1279-80.  See also Minix v. Jeld-Wen, Inc., 2007 WL 1828259 at *8 (11th Cir. June 27, 2007) (unpub. op.) (quoting Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 503 (7th Cir. 1994) ("When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination ... are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge.")).[10]

---

[10]Further, the plaintiff has not shown that she could prevail on the merits of these claims because she has not established a prima facie case of pay discrimination based on her national origin or gender.

A plaintiff establishes a prima facie case of disparate pay by presenting evidence that she is a member of a protected class and that nearly identical comparators outside the protected class were paid more than she was.  Boykin v. Bank of America Corp., 2005 WL 3479878 at *1 (11th Cir. Dec. 21, 2005) (unpub. op.), cert. denied, 126 S.Ct. 2931 (1996);

The EEOC charge would support a claim of national origin discrimination unrelated to pay since it alleged favoritism on that basis (Doc. 1, Ex. A, p. 2). Moreover, the plaintiff's complaint does contain in Count VIII a general claim of national origin discrimination in violation of the FCRA, unlike the sex discrimination claim in Count V, which focuses on disparate pay (compare Doc. 1, p. 12 with p. 16).

Nevertheless, in the plaintiff's response to the motion for summary judgment, the plaintiff limited her national origin claim to one involving pay increases received by Apanovich after the plaintiff was no

---

Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). It is emphasized that, in order to meet the comparability requirement, the comparators must be "nearly identical" in all relevant respects to prevent courts from second-guessing reasonable decisions by the employer. Id.

The plaintiff's national origin discrimination claim unquestionably fails because the plaintiff received a higher salary than both of the Hispanic ASMs during her tenure with the defendant (see Doc. 24, p. 13). The plaintiff attempts to salvage this claim with the unpersuasive argument that Apanovich's salary increases after the plaintiff no longer worked for the defendant show unlawful discrimination (Doc. 32, pp. 23-24). However, once the plaintiff stopped working for the defendant, Apanovich ceased being a proper comparator. See Boykin v. Bank of America Corp., supra; Wilson v. B/E Aerospace, Inc., supra.

Further, neither of the male ASMs in the Zephyrhills store that were paid more than the plaintiff are proper comparators for her claim of disparate pay based on gender. Thus, Chewning's higher salary was based on his prior position as a building remodel manager, and Roth was paid more because he had consistently earned higher performance evaluations than the plaintiff dating back to fiscal year 2001 (Doc. 27, ¶¶ 18-21). Furthermore, the plaintiff's argument that her greater experience and seniority warrant a higher salary and, therefore, show pretext (Doc. 32, p. 15), is unpersuasive because it is undisputed that the defendant determines salary raises based on job performance (Doc. 27, ¶¶ 16-17; see also Doc. 33, Ex. 7, p. 39). Underscoring the lack of merit in this claim is the fact that Avellaneda, a male ASM (and a Hispanic male at that), was paid substantially less than the plaintiff.

longer working (Doc. 32, pp. 23-24).  While the plaintiff mentioned in her statement of facts allegations that Fines favored Avellaneda with information about sales promotions (id. at p. 4), she did not articulate any legal argument supporting a national origin discrimination claim based on favoritism shown to Avellaneda.  Accordingly, any such claim is deemed abandoned.[11]

In sum, the plaintiff's Title VII claims and her FCRA claims of national origin and gender discrimination premised on disparate pay are barred for failure to comply with procedural requirements.  Further, there was no claim articulated in response to the summary judgment motion based on national origin favoritism.  Therefore, just the plaintiff's claims of retaliation and sexual harassment remain for consideration.  The defendant argues that it is entitled to summary judgment on the merits of these remaining claims.  Because the plaintiff has not satisfied her burden of coming forth with

---

[11]Notably, a valid legal argument on this point would require the plaintiff to show that she suffered an adverse employment action due to Fines's favoritism toward Avellaneda.  Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).  It does not appear that the plaintiff can make such a showing.  In particular, the evidence does not indicate that the plaintiff suffered any adverse consequence due to an alleged withholding of sales promotion information that was purportedly provided to Avellaneda sooner than it was to the plaintiff (Doc. 33, Ex. 7, pp. 56-57).  The plaintiff was being paid thousands of dollars more than Avellaneda (see Doc. 24, p. 13).  Even more significant, for the fiscal year 2004, which was the period when the plaintiff and Avellaneda were under Fines's supervision, the plaintiff received better performance ratings and was due a larger pay increase than Avellaneda (Doc. 27, ¶¶ 24, 25).  Therefore, it seems that, even if the plaintiff had properly articulated a claim of national origin discrimination based on Fines's alleged favoritism toward Avellaneda, the claim would fail.

probative evidence sufficient to create a genuine material issue of fact as to either claim, summary judgment is appropriate on  the plaintiff's retaliation and sexual harassment claims.[12]

## IV.

The plaintiff has not presented any direct evidence of retaliation.[13]  Rather, she proceeded with her claim using the framework outlined in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973), which applies to retaliation claims.  <u>Johnson</u> v. <u>Booker T. Washington Broadcasting Serv., Inc.</u>, 234 F.3d 501, 511 n.10 (11th Cir. 2000).

In order to establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the

---

[12]Although the Title VII claims are being dismissed on a procedural ground and only FCRA claims are being considered on the merits, it is proper to rely upon authority under Title VII. Thus, because the FCRA is patterned after Title VII, courts routinely apply Title VII caselaw to discrimination claims brought under the FCRA.  <u>Harper</u> v. <u>Blockbuster Entm't Corp.</u>, 139 F.3d 1385, 1387 (11th Cir. 1998), <u>cert</u>. <u>denied</u>, 525 U.S. 1000 (1998).

[13]Fines's alleged statement to Scalone that "he would take the plaintiff down" is not direct evidence of retaliation because "[a] statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination." <u>Berman</u> v. <u>Orkin Exterminating Co., Inc.</u>, 160 F.3d 697, 701 (11th Cir. 1998); <u>see also</u> <u>Wright</u> v. <u>Southland Corp.</u>, 187 F.3d 1287, 1298 (11th Cir. 1999) (Direct evidence is "evidence, that,  if believed, proves the existence of a fact in issue without inference or presumption."). Moreover, the statement was made before Scalone and the ASMs met with Dixon regarding complaints about Fines's behavior, and thus could not be evidence of retaliation.

adverse employment decision.  <u>Nichols</u> v. <u>CSG Systems, Inc.</u>, 2007 WL 2415178 at *3 (11th Cir. Aug. 27, 2007)(unpub. op.).  The burden then shifts to the defendant to rebut the presumption of retaliation by producing a legitimate reason for the adverse employment action.  <u>Id</u>.  The presumption of retaliation then drops from the case and it is the plaintiff's burden to prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for retaliation.  <u>Id</u>.

The plaintiff argues that she engaged in statutorily protected activity when she and several other ASMs complained as a group to Dixon in October 2004 and January 2005 about Fines's conduct (Doc. 32, p. 20).  The plaintiff contends that, in retaliation for those complaints, the defendant (1) "held a surprise SPR audit ... knowing her paperwork would not be ready and causing the Zephyrhills store to fail," (2) investigated [her] for "planning to give a copy of the Code of Conduct to an individual who was still employed with the company" and (3) did not pay her all of the vacation pay to which she was entitled (<u>id</u>.; Doc. 33, Ex. 7, pp. 206-07).[14]  As the defendant argues (Doc.

_____

[14]At the hearing, the plaintiff additionally argued that Fines's treatment of her was retaliatory.  In this regard, the plaintiff stated in her deposition that Fines "was distancing himself from [her]" and "was continuing to be secretive ... just talking to Jose on the side" (Doc. 33, Ex. 7, pp. 113, 115, 116).  The plaintiff did not make this argument in her summary judgment response, which unfairly deprives the defendant of an opportunity to respond properly to this allegation.  In any event, a retaliation claim based on this conduct is not cognizable.  First, general observations about a supervisor's hostile demeanor or

24, pp. 19-24), the plaintiff cannot establish all essential elements of a retaliation claim.

A. First, it is questionable whether the plaintiff engaged in statutorily protected activity. A plaintiff participates in a protected activity by reporting that the employer was engaged in an unlawful employment practice. Brown v. City of Opelika, 2006 WL 3690693 at *1 (11th Cir. May 30, 2006) (unpub. op.). The plaintiff does not need to prove as part of a retaliation claim that the employer's actions were in fact unlawful, but only that she had a "a good faith, reasonable belief" that the conduct was unlawful. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). A belief of discrimination is reasonable if the conduct is close enough to an actionable claim to support an objectively reasonable belief that it is. Clover v. Total System Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

---

insufficient to support a retaliation claim. Nichols v. CSG Systems, Inc., supra, 2007 WL 2415178 at *4; see also Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006) ("[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," including snubbing by supervisors). Moreover, in view of the absence of an articulated argument in the response, the plaintiff has failed to explain how this conduct constitutes an adverse employment action. Further, a causal relationship is lacking between her purported statutorily protected activity and this alleged harassing conduct because, according to the plaintiff, this type of conduct started long before she engaged in any purported protected activity (Doc. 33, Ex. 7, pp. 52-53, 56, 84). See Beard v. 84 Lumber Co., 2006 WL 2946883 at *6 (11th Cir. Oct. 17, 2006) (unpub. op.) (causal connection is lacking when working conditions were "equally bad" after engaging in protected activity).

The defendant argues that the plaintiff did not engage in statutorily protected activity because the plaintiff did not complain of an unlawful employment practice  (Doc. 24, p. 20).  See Brown v. City of Opelika, supra.  Thus, it argues that the plaintiff's own complaints to Dixon are not actionable because they were "general complaints about Fines's personality and leadership style" without any "allegations regarding discrimination based on any protected status" (id.).

The plaintiff does not disagree with this characterization of her conversation with Dixon.   Rather, she responds that complaints of employment discrimination and retaliation made by other ASMs were collectively presented to Dixon and, therefore, they are attributable to her (Doc. 32, pp. 6-7, 20).   There is evidence suggesting that the ASMs' complaints in October 2004 were perceived to be a group complaint, as Dixon met with the ASMs as a group twice regarding their complaints, and the plaintiff stated that Dixon told them that they had the same problem together and that they could be each other's support group (see Doc. 33, Ex. 6, HD 0976; id. at Ex. 7, pp. 101, 103, 107-08; Doc. 34, Ex. 10, pp. 61, 68; Scalone Dep., p. 91).  However, the plaintiff has not cited any legal authority for the proposition that a plaintiff can oppose unlawful employment discrimination

based on someone else's complaint.  Therefore, it is questionable whether the plaintiff has even satisfied this element of a retaliation claim.  Due to other deficiencies in the plaintiff's retaliation claim which render her claim unmeritorious, this issue need not be resolved.

In all events, the plaintiff cannot show that the lunch discussion with Dixon in January 2005 constituted statutorily protected activity because the plaintiff could not have reasonably believed that she and her colleagues complained about an unlawful employment practice.  See Clover v. Total System Servs., Inc., supra.  In this connection, the plaintiff states that Dixon was told in January 2005 that "Fines continued to make inappropriate comments of a sexual nature and favor a Hispanic employee" (Doc. 32, p. 20). However, the only alleged sexual comment underlying this complaint was Fines telling Scalone on one occasion that she looked nice (see Doc. 32, p. 9, citing to Scalone Dep., p. 135).  This comment, and the vague assertion of favoritism, do not come close to an actionable claim of claim of discrimination.   See Clover v. Total System Servs., Inc., supra.  Therefore, the plaintiff could not have held a reasonable belief that this complaint constituted statutorily protected activity.  Accordingly, she cannot premise her

retaliation claim on the allegation that she engaged in statutorily protected activity in January 2005.

B.  Assuming that the plaintiff engaged in protected activity in October 2004 as part of a group complaint, the three employment actions of which the plaintiff complains are not actionable because they are not, as a matter of law, adverse employment actions.

A plaintiff alleging retaliation has suffered an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) (internal quotation marks omitted).  Although this provision encompasses more than "acts that affect the terms and conditions of employment," it "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 2414.  The requirement of a material adversity is meant to distinguish significant from trivial harms.  Id. at 2415.  Thus, petty slights, minor annoyances, and lack of good manners are not covered.  Id.  Moreover, neither are personality conflicts that generate antipathy and snubbing by supervisors and co-workers.  Id.

The plaintiff argues that the SPR on Friday, March 4, 2005, was retaliatory because she did not know that the SPR was scheduled for that day and, as a result, she did not have the pertinent paperwork completed (Doc. 32, p. 20).[15]   It is unreasonable, as a matter of law, to conclude that the SPR was a materially adverse action because a regularly occurring monthly audit, even without prior notice, would not dissuade a reasonable employee from reporting discrimination, since an employee who does her job in a timely manner would not suffer any negative consequences from a surprise audit. Further, the plaintiff did not receive any discipline or otherwise sustain a loss of any job benefit for failing to fulfill timely her responsibilities in connection with the SPR; the consequences for a failed SPR would fall upon Fines, the store manager (Doc. 28, pp. 1-2).  See Burlington Northern & Santa Fe Ry. Co. v. White, supra, 126 S.Ct. at 2415 (the anti-retaliation provision applies to "retaliation that produces injury or harm").

The plaintiff also alleges that the defendant retaliated by investigating her "for planning to give a copy of the Code of Conduct to an

---

[15]It is noted that, contrary to the plaintiff's assertion, the monthly SPRs are not normally performed on Tuesdays (see Doc. 32, p. 22).  Thus, the declaration of Elena Kontamanys, the individual who performs the SPRs, specifies the days upon which the SPRs took place, and it shows that, of the ten SPRs that were conducted prior to the one in March 2005, only four of those occurred on a Tuesday (Doc. 28, ¶5).

individual who was still employed with the company" (Doc. 32, p. 20).  The

defendant's investigation of the plaintiff was prompted by an allegation that

the plaintiff misappropriated a confidential salary document, not a "Code of

Conduct," and the plaintiff's attempt to obfuscate the issue underscores the

weakness of this argument (see Doc. 27, ¶¶ 9-12).[16]  Here, the plaintiff was

placed on paid administrative leave for one day, which happened to be a

Saturday, while the defendant conducted an investigation into a bona fide (and

subsequently substantiated) allegation of employee misconduct.  In other

words, to permit the defendant expeditiously to investigate the allegation of

misconduct, the plaintiff was given a Saturday off, with pay.  The

investigation, therefore, cannot reasonably be viewed as an adverse

employment action.

The plaintiff also alleges that she was retaliated against by being

denied vacation pay.  The plaintiff, however, has failed to substantiate her

---

[16]Thus, the unrefuted evidence shows that the investigation was prompted by
Apanovich's allegation that the plaintiff improperly removed from the store confidential
salary information; that Blackerby and Panza questioned the plaintiff about taking this
confidential information; and that, if the plaintiff had not left on medical leave, she would
have been disciplined in connection with misappropriating confidential salary
documentation (but only with a counseling notice) (Doc. 27, ¶¶ 9-13; Doc. 27-3; Doc. 33,
Ex. 7, pp. 137-38; Doc. 34, Ex. 10, pp. 137-38).  The plaintiff's removal of a "Code of
Conduct" is mentioned by the *plaintiff* in her deposition.  In this connection, the plaintiff
stated during the investigation that she  had planned to remove a  Code of Conduct and
give it to Scalone (Doc. 27, ¶11; Doc. 33, Ex. 7, p. 151).

allegation that she is owed any additional vacation pay, so that an adverse employment action cannot be based upon a withholding of vacation pay.

The defendant has averred that, in accordance with company policy, the plaintiff accumulated four weeks of vacation as of the date she went on FMLA leave (Doc. 27, ¶15).  Based on its compensation for a forty-hour week, she accumulated one hundred and sixty hours of vacation pay (id.; Doc. 25-22).  The plaintiff was paid for those four weeks, in addition to thirteen weeks of salary continuation pay that the defendant provides as a benefit to salaried managers (Doc. 27,  ¶15).

The plaintiff has failed to show any inaccuracies in the defendant's computation, or provide an alternative method of computing vacation time which shows that she is entitled to an additional two or three weeks of vacation pay. See Galloway v. GA Technology Authority, 2006 WL 1327808 at *4 (11th Cir. May 16, 2006) (unpub. op.) (the plaintiff's "subjective belief that [s]he was being unfairly denied benefits is insufficient" to show retaliation). Rather, the plaintiff makes a cryptic allegation that, due to a change in corporate policy, she lost vacation time that she had accrued up to July (Doc. 32, p. 23; Doc. 33, Ex. 7, pp. 186-87).  In light of the defendant's averment that the plaintiff was paid all of the vacation time that

she accrued "as of the date she went on FMLA leave" (Doc. 27, ¶15), the plaintiff must present specific facts showing that the defendant's calculation is wrong or that she was entitled to accumulate vacation pay beyond that date. See Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989) ("[m]ere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."). Under these circumstances, the plaintiff has failed to raise a factual issue that there was an adverse employment action concerning vacation pay.

C. The defendant also argues, persuasively, that the plaintiff has failed to establish the requisite causal connection between her alleged protected activity and any of the purported adverse employment actions (Doc. 24, pp. 23-24). To establish a prima facie case on this element, the plaintiff must merely show that the protected activity and the alleged adverse action are not completely unrelated. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000), cert. denied, 532 U.S. 1037 (2001). This requires, at a minimum, that the decisionmakers were aware of the protected conduct and that there was close temporal proximity between the protected conduct

and the adverse action.  <u>Farley</u> v. <u>Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999).

The plaintiff cannot show the requisite causal connection between her purported protected activity and either the March 4 SPR, or the alleged withholding of vacation pay, because she has not created a genuine issue of material fact regarding the decisionmaker's knowledge of her protected conduct.  In this regard, it is noted that "[i]t is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression."  <u>See</u> <u>Bass</u> v. <u>Bd. of County Comm'rs, Orange County, Fl.</u>, 256 F.3d 1095, 1119 (11th Cir. 2001).

The evidence shows that district loss prevention manager Kontamanys was responsible for the scheduling of the March 4 SPR (Doc. 28).  The defendant asserted in its motion that "[t]here is no factual basis for any inference that Kont[]amanys knew about Plaintiff's complaints against Fines or would want to retaliate against Plaintiff because of them" (Doc. 24, p. 23).  This statement placed a burden upon the plaintiff to come forward with some evidence showing that Kontamanys knew about the plaintiff's purported protected activity.  The plaintiff has failed to do so (<u>see</u> Doc. 32, pp.

20-21, 22-23).  Consequently, since there is no evidence that Kontamanys had knowledge of the plaintiff's complaints about Fines, there is no plausible basis for a contention that she scheduled the March 4 SPR in retaliation for those complaints.

Moreover, Kontamanys unequivocally stated (Doc. 28, ¶7):

> I schedule the SPRs randomly, as my schedule allows, and do not consult with any other person in deciding when to conduct SPRs.  I never have received a request to conduct an SPR on a certain day, nor would I consider such a request to be appropriate.

In particular, Kontamanys averred that the SPR of the Zephyrhills store on March 4, 2005, was conducted without receiving input from anyone (id. at ¶8).  The plaintiff has not come forward with any evidence to the contrary.

The plaintiff, instead, attempts to overcome this glaring deficiency by speculating that Fines somehow had input into the scheduling of this SPR (Doc. 33, Ex. 7, p. 173).  However, her speculation does not create a genuine issue of material fact, Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1182 (11th Cir. 2005), especially in this circumstance, where there is affirmative evidence from Kontamanys that Fines had no input into the scheduling of the March 4 SPR.  See Henderson v. Waffle House, Inc., 2007 WL 1841103 at *5 (11th Cir. June 28, 2007) (unpub. op.) (speculation that a

district manager was "likely" involved in her termination does not permit a reasonable inference of her involvement in the termination in light of evidence that the decisionmaker did not confer with anyone else in making the decision).[17]   Therefore, Kontamanys's lack of knowledge of the plaintiff's protected activity forecloses any causal connection between it and the scheduling of the March 4 SPR, or Kontamanys's alleged failure to give the plaintiff advance notice of that audit.

The plaintiff similarly fails to meet the threshold requirement of knowledge by the decisionmaker with regard to her allegation that a loss of vacation pay was retaliatory.  Thus, there is no evidence that the personnel in the defendant's corporate benefits department, who computed the plaintiff's vacation benefits, were aware of her protected activity.  Accordingly, the plaintiff has failed to adduce any evidence indicating that there is a causal relationship between the plaintiff's purported protected activity and the alleged loss of vacation pay.

Additionally, the plaintiff cannot show temporal proximity between the purported protected activity and any of the alleged adverse job

---

[17]It, moreover, defies common sense that Fines would arrange for the SPR to take place on a date he knew his store would fail because it is Fines, not the plaintiff, who is held responsible for the results of the SPR (Doc. 28,  ¶4).

actions.   Thus, the group complaint to Dixon in October 2004 is too far removed from the alleged adverse actions, which occurred in March 2005 or later, to infer reasonably any causal relationship.  Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (three- to four-month gaps are insufficient); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) (three-month gap insufficient to establish a causal relationship).

The plaintiff, instead,  argued at the hearing that Fines's alleged comment that he was going "to take down" the plaintiff before she took him down shows a causal connection between her protected activity and the adverse employment actions.  However, this comment does not establish a causal connection because the plaintiff has not presented any probative evidence that Fines was involved in any of the alleged adverse actions.  See Mack v. ST Mobile Aerospace Engineering, Inc., 2006 WL 2129661 at *14 (11th Cir. July 31, 2006) (racial comment insufficient to raise a genuine issue of fact on pretext because there was no evidence that the person who uttered the comment was involved in the decisionmaking).  Thus, the admissible evidence shows that Kontamanys was the decisionmaker regarding the alleged retaliatory March 4 SPR; that Blackerby and Panza were involved in the investigation into the plaintiff's misconduct; and that unnamed people in the

defendant's corporate office determined the plaintiff's accrual of vacation benefits.  The plaintiff's speculation to the contrary is insufficient on a motion for summary judgment.  See Henderson v. Waffle House, Inc., supra, 2007 WL 1841103 at *4 ("mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment.").

Consequently, the plaintiff has failed to establish a prima facie case of retaliation with respect to any of the three challenged actions.

D.  Moreover, even assuming that the plaintiff can establish a prima facie case of retaliation, summary judgment in favor of the defendant is warranted because the plaintiff has not rebutted the defendant's legitimate non-retaliatory reasons for the purported adverse job actions (Doc. 24, p. 24).

Once the defendant proffers legitimate, non-retaliatory reasons for each of the alleged adverse job actions, the burden shifts to the plaintiff to "present significant probative evidence that the articulated reason[s] [are] merely a pretext for discrimination." Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  In this regard, the plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  Vessels

v. Atlanta Independent School System, 408 F.3d 763, 771 (11th Cir. 2005).

The Eleventh Circuit has cautioned (Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)):

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

With regard to the March 4 SPR, the plaintiff has not refuted the defendant's legitimate, non-discriminatory reason that this audit was a routine monthly function performed for the business purpose of loss prevention, and that it was scheduled at the convenience of the district loss manager. The plaintiff argues that the March 4 SPR was a pretext for retaliation because it was the first time that she did not receive advance notice of its scheduling (Doc. 32, pp. 10-11, 22). However, Kontamanys stated that the ASMs know that the SPR will take place before the fifteenth of each month, but typically they do not know the exact day she will perform the reviews in their store (Doc. 28, ¶5). She added that she holds weekly conference calls with the ASMs on Tuesday and will occasionally hint the general time frame for the

SPR, but she does not always do so (id. at ¶6).  The evidence therefore shows that there was not some policy to provide advance notice of SPRs.[18]

In any event, there is no evidence from which a reasonable jury could infer that the SPR was a retaliatory act.  As previously explained, the plaintiff has not adduced any evidence indicating that Kontamanys, who purportedly deviated from her past practice of giving advance notice of SPRs, knew at that time that the plaintiff had (arguably) engaged in protected activity.  McShane v. U.S. Attorney General, 2005 WL 1799435 at *9 (11th Cir. Aug. 1, 2005) (unpub. op.) (quoting Brochu v. City of Rivera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002) ("neither a court nor a jury may impute knowledge to a decision maker who has sworn he has no actual knowledge")).  Consequently, the plaintiff has failed to show that Kontamanys was retaliating against the plaintiff for her complaints against Fines when she conducted an unannounced SPR.

---

[18]This is confirmed by the plaintiff's deposition testimony.  Thus, at her deposition the plaintiff stated that unscheduled SPRs were more difficult because they would have to search all over the store for the shrink books which were stored in different areas (Doc. 33, Ex. 7, p. 168). This testimony suggests that the plaintiff has experienced unannounced SPRs previously.

Furthermore, the plaintiff states  in her response that Apanovich always received prior notice of SPRs (Doc. 32, p. 22).  However, Apanovich did not receive the date of the SPRs from Kontamanys; rather, she stated she would deduce the date of the SPR from speaking with other managers (Doc. 34, Ex. 11, pp. 141-42).

The plaintiff has also failed to rebut the defendant's explanation that it investigated her and placed her on a brief, paid administrative leave for the legitimate business purpose of determining the veracity of Apanovich's allegation that the plaintiff had misappropriated a confidential salary document (Doc. 27, ¶¶ 9-12; <u>see</u> Doc. 25-5).[19] Although the plaintiff asserts that, in her opinion, the situation was blown out of proportion, she acknowledges that the defendant has investigated other employees for misconduct and placed them on administrative leave during those investigations (Doc. 33, Ex. 7, p. 238; <u>see also</u> Doc. 34, Ex. 10, pp. 113-14 (noting that the defendant's Code of Conduct provides that paid administrative leave during investigations is appropriate)).[20]

_____

[19]The plaintiff argues in a conclusory manner that there "are several inconsistencies in the record with regard to Ms. Apanovich's testimony and a jury should be allowed to determine the credibility of the witnesses" (Doc. 32, p. 6 n.2). However, the veracity of Apanovich's statements to the defendant regarding the plaintiff's misappropriation of the confidential salary document and other paperwork is irrelevant because the issue is not whether the plaintiff in fact engaged in misconduct, but whether the defendant acted reasonably upon the reported information. <u>See</u> <u>Elrod</u> v. <u>Sears, Roebuck & Co.</u>, <u>supra</u>; <u>Hawkins</u> v. <u>Ceco Corp.</u>, 883 F.2d 977, 980 n.2 (11th Cir. 1989), <u>cert</u>. <u>denied</u>, 495 U.S. 935 (1990) (That the employee did not in fact engage in misconduct is irrelevant to the question whether the employer believed that the employee had done wrong). Thus, regardless of whether Apanovich truthfully reported the plaintiff's actions, the defendant reasonably investigated the allegations in light of Apanovich's statements.

[20]The plaintiff alleges that Fines has improperly taken, or reviewed, confidential documents without investigation by the defendant (Doc. 33, Ex. 7, pp. 221-24). However, the situations are not comparable because those allegations were not reported to his superiors (<u>id</u>. at pp. 221-22).

The plaintiff asserts as evidence of pretext her "belie[f] that Ms. Blackerby was influenced by Mr. Fines, [Blackerby] was negligent, and showed a disregard towards Plaintiff" (Doc. 32, p. 23; <u>see</u> <u>also</u> Doc. 33, Ex. 7, 197-99). However, Blackerby has averred that Fines had no input into the plaintiff's investigation, her placement on administrative leave, or her discipline (Doc. 27, ¶14), and the plaintiff admittedly has no evidence to the contrary (Doc. 33, Ex. 7, pp. 173-74).

Further, the plaintiff's conclusory and cryptic beliefs that Blackerby was somehow "negligent," and that she had a "blatant disregard" for the plaintiff (<u>id</u>. at pp. 197-99) do not show intentional retaliation, and the record is devoid of any probative evidence from which a reasonable jury could conclude that Blackerby had a retaliatory animus towards her. <u>See</u> <u>Elrod</u> v. <u>Sears, Roebuck and Co.</u>, <u>supra</u>, 939 F.2d at 1471 ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate non-[retaliatory] reasons for its action."). In sum, there is no meaningful evidence from which a reasonable jury could conclude that the defendant's investigation of the plaintiff, or the manner in which it was conducted, was retaliatory.

Similarly, the plaintiff has not shown that the defendant's calculation of her vacation pay was incorrect, much less that it was a pretext for retaliation. The plaintiff cannot establish that the defendant's computation of vacation leave was retaliatory without at least showing that the amount that was paid was erroneous. As previously explained, the plaintiff has made no such showing. Furthermore, even if there were a demonstrated factual dispute about the vacation pay, the retaliation claim would still fail on this point in view of the plaintiff's lack of evidence indicating that the individuals responsible for computing vacation pay had knowledge of the plaintiff's complaints about Fines. Without such knowledge, they obviously were not engaging in retaliation. Therefore, a reasonable jury could not find on this record that the plaintiff was denied vacation benefits in retaliation for engaging in statutorily protected conduct.

For these reasons, the plaintiff has failed to establish a prima facie case of retaliation. Furthermore, she has not presented any probative evidence from which a reasonable jury could conclude that the defendant's challenged actions were a pretext for retaliation and that the defendant had, in fact, engaged in retaliation. Therefore, the defendant is entitled to summary judgment on the plaintiff's claim of retaliation.

V.

The defendant contends that it is also entitled to summary judgment on the plaintiff's sexual harassment claim. This contention is correct because the sexual harassment claim lacks merit. Moreover, the defendant has established an affirmative defense to that claim.

To establish a prima facie case of sexual harassment, a plaintiff must establish (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) that there is a basis for holding the employer liable. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000), cert. denied, 531 U.S. 1076 (2001).

It is established that an actionable hostile work environment sexual harassment claim requires proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation omitted); see also Clark County School Dist. v. Breeden, supra, 532 U.S. at 270. This standard is designed to be "sufficiently

demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, supra (citation omitted); see also Clark County School Dist. v. Breeden, supra, 532 U.S. at 271.

The plaintiff does not base her sexual harassment claim on any comments of a sexual nature made to her (Doc. 33, Ex. 7, p. 91).  Rather, the plaintiff states that she was made uncomfortable by Fines's attempts to set up two other employees on dates in her presence and from hearsay that Fines had made sexual comments to Scalone and Apanovich (id. at pp. 91-98).  With respect to the latter incidents, the plaintiff was told that Fines questioned Scalone about seeing naked a Home Depot male employee who was living in her home and asked what she would do if he  got a "hard on" (id. at pp. 95-96).  The plaintiff was also told that Fines commented to Apanovich that she needed a real man (id. at p. 97).

The defendant correctly argues  that "the totality of the sexual conduct about which [the plaintiff] complains – two off-color crude comments

[made] to female colleagues not in her presence and attempts to set female colleagues up on dates that Plaintiff witnessed – does not approach the severe and pervasive conduct necessary for actionable sexual harassment" (Doc. 24, p. 28).  See Gupta v. Florida Bd. of Regents, supra,  212 F.3d at 586  ("[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment");  Howard v. City of Robertsdale, 2006 WL 304552 at *5 (11th Cir. Feb. 9, 2006) (unpub. op.) (sexual jokes and offensive comments to female employees about their bodies and sex lives did not rise to the level of discrimination even when made on a regular basis).

The plaintiff attempts to buttress this patently weak claim by alleging as part of the hostile work environment incidents of purportedly abusive conduct based on her gender (Doc. 32, pp. 16-17).  A claim of sexual harassment can be based on gender, as opposed to comments or conduct purely sexual in nature.  Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497, 1503 (11th Cir. 1985).  Thus, the Eleventh Circuit has held that sexual harassment includes "threatening, bellicose, demeaning, hostile or offensive

conduct by a supervisor in the workplace because of the sex of the victim of such conduct...."  <u>Id</u>.

In this regard, the plaintiff asserts as evidence of a hostile work environment claim that Fines withheld key information from her,  would not speak to her on the telephone, would badger her if she did not complete a task, arranged for extraordinary audits of her department,  questioned the plaintiff's leadership, and  screamed at  her on  two  occasions  during  which  she  felt physically threatened  (Doc. 32, pp. 16-17; Doc. 33, Ex. 7, pp. 52-53, 62-63, 65-68).  The plaintiff, however, fails to present probative evidence that any of this alleged conduct, which is gender-neutral on its face, was motivated by her gender.  <u>See</u> <u>Baldwin</u> v. <u>Blue Cross/Blue Shield of Alabama</u>, 480 F.3d 1287, 1301-02 (11th Cir. 2007) (Title VII "does not prohibit harassment alone, however severe and pervasive.  Instead, Title VII prohibits ... harassment that discriminates based on a protected category such as sex.").  To the contrary, the plaintiff's deposition testimony that Fines gave Apanovich, a *female* ASM, "more guidance, information and support" and that "[h]e would call the store and ask for [her]" (Doc. 33, Ex. 7, pp. 56, 86) is contrary to an inference that this conduct was gender-related.  Additionally, ASMs Chewning and Roth, who are white males, characterized Fines as abusive and belittling (<u>id</u>. at Ex.

6, HD 0979-80), thereby indicating that Fines's abrasive conduct was gender-neutral.  Therefore, it is appropriate to disregard these allegations, which the plaintiff has failed to show were motivated by her gender, in determining whether there was a hostile working environment involving gender-based harassment.  See Gupta v. Florida Bd. of Regents, supra, 212 F.3d at 583-84.

Moreover, even if this conduct were gender-related, the totality of the circumstances (including the sexual-related comments) would not rise to the level of severity required to maintain a hostile work environment claim.  Thus, much of what the plaintiff alleges are petty annoyances that do not come close to creating a hostile work environment.[21]  With regard to the more substantial allegations, the plaintiff identifies two screaming incidents over the fifteen months that she worked for Fines (Doc. 33, Ex. 7, pp. 99-101).  These two isolated incidents, while most likely  temporarily upsetting, are not sufficiently severe to alter the conditions of the plaintiff's employment and create an abusive working environment.   Harris v. Forklift Systems, Inc.,

---

[21]For example, the alleged extraordinary audits consisted of auditors reviewing paperwork and checking how the department was running (Doc. 33, Ex. 7, pp. 64, 68).  Fines's questioning her leadership consisted of Fines inquiring about the plaintiff's management style and whether the subordinates  were getting what they needed from the plaintiff (id. at pp. 71, 76).  Further, the only example of Fines attempting to pit the female managers against each other was Fines telling the plaintiff that Apanovich was upset about an incident that the plaintiff thought they had resolved (id. at pp. 79-81).  The plaintiff has not even identified an example of Fines "badgering her if she did not complete a task."

supra, 510 U.S. at 21-22.  In this respect, the plaintiff has failed to articulate any way in which her conditions of employment were altered by the two incidents.  Moreover, where, as here, the incidents are isolated, the conduct must be "extremely serious" to amount to changes in the conditions of employment.  Faragher v. City of Boca Raton, supra, 524 U.S. at 788.  These two incidents of being yelled at clearly do not rise to that level.

Furthermore, this conclusion is corroborated by the plaintiff's additional complaint that, when Fines called into the store, he sought to speak with others, rather than her (Doc. 33, Ex. 7, p. 53).  If the yelling incidents were so severe that they altered the conditions of employment, the plaintiff would have been relieved that Fines was not asking to speak with her and would not be complaining about it.  The two isolated incidents of yelling, therefore, did not create a hostile work environment.  And this is so even when considered along with the plaintiff's other petty annoyances, including the alleged withholding of information.

Significantly, the plaintiff fails to identify with any specificity how her job performance was adversely affected by Fines allegedly withholding information from her.  In fact, the plaintiff's complaint is not that she did not receive sales promotion information, but that she would have liked

to have it sooner than she received it.  Thus, she testified that she got the information at the Wednesday department-head meetings, "but it would have been nice to know it before the meeting" (id. at p. 57).  A working-condition complaint of this kind cannot bolster a claim of a hostile work environment.

Furthermore, the claim that Fines interfered with the plaintiff's ability to do her job by withholding information seems improbable.  After all, Fines, as the store manager, was responsible for the store's performance. Consequently, if Fines interfered with the plaintiff's ability to do her job, that would amount to a self-inflicted injury.  Adding to the implausibility of this assertion is the statement by Kontamanys that, at the last discussion of ASMs' performance reviews and pay increases involving the plaintiff, Fines openly praised the plaintiff and fought to give her a high performance rating (Doc. 28, ¶11).  Under these circumstances, the plaintiff's assertion that Fines had withheld information from her adds no meaningful weight to her claim of a hostile work environment.

For these reasons, the plaintiff has failed to create a genuine material issue of fact regarding her hostile work environment sexual harassment claim.  Rather, the claim fails as a matter of law.

The defendant has also persuasively argued that it is entitled to summary judgment on the sexual harassment claim based on the affirmative defense stated in <u>Faragher</u> v. <u>City of Boca Raton</u>, <u>supra</u>, and <u>Burlington Industries, Inc.</u> v. <u>Ellerth</u>, 524 U.S. 742 (1998).  This affirmative defense absolves the employer of vicarious liability for the actions of supervisory employees if the employer (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities."  <u>Baldwin</u> v. <u>Blue Cross/Blue Shield of Alabama</u>, <u>supra</u>, 480 F.3d at 1303.

The defendant's  Employees Practices Statements clearly set forth the defendant's prohibition against discrimination, workplace harassment, sexual harassment and retaliation, and provides a mechanism to report such conduct (Doc. 26-6, Ex. A).  This constitutes prima facie evidence that the defendant has exercised reasonable care to prevent sexually harassing conduct.  <u>See</u> <u>Madray</u> v. <u>Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1299 (11th Cir. 2000).  Furthermore, the defendant acted promptly to correct any sexually harassing behavior after being alerted that Fines had made inappropriate sexual comments to employees.  Thus, the allegations against Fines were

investigated and, as a result, Fines received a stern final warning and written discipline (Doc. 33, Ex. 6, HD 0970; Doc. 34, Ex. 10, pp. 68-70).

The plaintiff argues that the defendant's discipline of Fines was inadequate (Doc. 32, p. 19). In this connection, the plaintiff alleges that "Fines continued to make unwelcome comments of a sexual nature to female employees" after he was disciplined. Id. However, the only evidence the plaintiff cites to in support of this contention is a reference to Scalone's deposition (see id. at pp. 9, 19) in which Scalone testifies that Fines said to her on one occasion, "Oh, you look really nice today. Why do you look so nice today?" (Scalone Dep., p. 135). Clearly, this comment is not evidence of continued sexual harassment. See Gupta v. Florida Bd. of Regents, supra, 212 F.3d at 584 ("A man can compliment a woman's looks ... by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment for having done so."). Therefore, although the plaintiff would have preferred that the defendant terminate Fines's employment, she has not shown that the remedy it chose was inadequate. See Baldwin v. Blue Cross/Blue Shield of Alabama, supra, 480 F.3d at 1306; Fleming v. Boeing Co., 120 F.3d 242, 246-47 (11th Cir. 1997).

The second prong of this defense requires that the employee unreasonably failed to take advantage of any preventive or corrective opportunities.  Since Fines's untoward conduct was reported, and the defendant promptly remedied the problem, this prong is arguably inapplicable in this instance.  Nonetheless, to the extent that the plaintiff argues that Fines continued to engage in sexually harassing conduct after he was disciplined, this prong is satisfied because the plaintiff did not properly alert the defendant to continued sexual harassment.  See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999) (the "employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem.");  Olson v. Lowe's, 2005 WL 1051559 at *6 (11th Cir. May 4, 2005) (the complaint "must be sufficient to put [the employer] on notice of the sexual harassment").  Therefore, summary judgment in the defendant's favor is also warranted on the sexual harassment claim based on its showing of the Faragher affirmative defense.

It is appropriate to add with respect to the sexual harassment claim that a similar claim was asserted by plaintiff's counsel in Scalone's case.  Judge Whittemore has granted the defendant's motion for summary judgment in that case (Doc. 43).  Since the sexual harassment claim there was

similar to the one made here, Judge Whittemore's decision provides support

for the conclusion that the plaintiff has failed to establish sexual harassment.

More importantly, because the <u>Faragher</u> affirmative defense was the same

there, as here, Judge Whittemore's conclusion that the defense had been

successfully demonstrated confirms that the defense applies here to defeat the

sexual harassment claim.

VI.

In sum, all of the plaintiff's Title VII claims, as well as her FCRA

claims of gender and national origin discrimination based on disparate pay, are

barred for failure to comply with procedural requirements.   Further, the

plaintiff has failed to create a genuine issue of material fact regarding the

merits of her FCRA claims of retaliation and hostile work environment sexual

harassment, as well as the affirmative defense on the latter claim.

Accordingly, the defendant is entitled to summary judgment on all of the

plaintiff's claims.

It is, upon consideration

ORDERED:

That the defendant's Dispositive Motion for Summary Judgment

(Doc. 24) be, and the same is hereby, GRANTED, and the Clerk shall enter

judgment for the defendant, dismissing all claims.  The Clerk shall thereupon

close this case.

DONE and ORDERED at Tampa, Florida, this 30th day of

October, 2007.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE